**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **JOHN M.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **No.  19-CV-01595** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **KILOLO KIJAKAZI,** | ) | **Magistrate Judge Jeffrey I. Cummings** |
| **Acting Commissioner of Social Security,** [1] | ) | |
| | ) | |
| **Defendant.** | ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

Plaintiff John M. [2] has been substituted as a party plaintiff for his deceased wife Cynthia

M. ("Claimant"), who made a claim for Disability Insurance Benefits ("DIBs") and

Supplemental Security Income ("SSI") under 42 U.S.C. §§416(i) and 423(d) of the Social

Security Act (the "Act"). Plaintiff brings a motion for summary judgment to reverse the final

decision of the Commissioner of Social Security (the "Commissioner") that denied Claimant's

claim for benefits.  The Commissioner has brought a cross-motion for summary judgment

seeking to uphold the decision to deny benefits.  The parties have consented to the jurisdiction of

the United States Magistrate Judge pursuant to 28 U.S.C. §636(c).  This Court has jurisdiction to

hear this matter pursuant to 42 U.S.C. §§405(g) and 1383(c)(3).  For the reasons stated below,

---

[1] Kilolo Kijakazi became the Acting Commissioner of Social Security Administration on July 9, 2021. Accordingly, pursuant to Federal Rule of Civil Procedure 25(d), Kilolo Kijakazi is substituted for Andrew Saul as the defendant in this case.

[2] Northern District of Illinois Internal Operating Procedure 22 prohibits listing the full name of the Social Security applicant in an opinion.  Therefore, only the plaintiff John M.'s first name shall be listed in the caption.

Claimant's motion for summary judgment (Dckt. #17) is granted, and the Commissioner's motion for summary judgment (Dckt. #24) is denied.

## I.      BACKGROUND

### A.      Procedural History

On June 30, 2015, Claimant filed a DIBs application pursuant to Title II and Title XVI, alleging a disability onset date of January 3, 2015 due to disorders of her back and affective/mood disorders.  (Record ("R.") 94, 96).  Her claim was denied initially on November 11, 2015, and upon reconsideration on April 1, 2016.  (R. 108, 114).  On December 7, 2017, an Administrative Law Judge ("ALJ") issued a written decision denying benefits to Claimant.  (R. 17-28).  The Appeals Council denied review on January 8, 2019, making the ALJ's decision the Commissioner's final decision.  (R. 1-3).  *Zurawski v. Halter*, 245 F.3d 881, 883 (7th Cir. 2001). Claimant subsequently filed this action in the District Court.

### B.      The Social Security Administration Standard to Recover Benefits

In order to qualify for disability benefits, a claimant must demonstrate that she is disabled.  An individual does so by showing that she cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §423(d)(1)(A).  Gainful activity is defined as "the kind of work usually done for pay or profit, whether or not a profit is realized."  20 C.F.R. §404.1572(b).

The Social Security Administration ("SSA") applies a five-step analysis to disability claims.  20 C.F.R. §404.1520.  The SSA first considers whether the claimant has engaged in substantial gainful activity during the claimed period of disability.  20 C.F.R. §404.1520(a)(4)(i). It then determines at step two whether the claimant's physical or mental impairment is severe

and meets the twelve-month duration requirement noted above.  20 C.F.R. §404.1520(a)(4)(ii).

At step three, the SSA compares the impairment or combination of impairments found at step

two to a list of impairments identified in the regulations ("the listings").  The specific criteria that

must be met to satisfy a listing are described in Appendix 1 of the regulations.  20 C.F.R. Pt. 404,

Subpt. P, App. 1.  If the claimant's impairments meet or "medically equal" a listing, the

individual is considered disabled, and the analysis concludes.  If the listing is not met, the

analysis proceeds to step four.  20 C.F.R. §404.1520(a)(4)(iii).

Before addressing the fourth step, the SSA must assess a claimant's residual functional

capacity ("RFC"), which defines her exertional and non-exertional capacity to work.  The SSA

then determines at step four whether the claimant is able to engage in any of her past relevant

work.  20 C.F.R. §404.1520(a)(4)(iv).  If the claimant can do so, she is not disabled.  *Id*.  If the

claimant cannot undertake her past work, the SSA proceeds to step five to determine whether a

substantial number of jobs exist that the claimant can perform in light of her RFC, age,

education, and work experience.  An individual is not disabled if she can do work that is

available under this standard.  20 C.F.R. §404.1520(a)(4)(v).

### C.    The Evidence Presented to the ALJ

The administrative record contains the following evidence regarding Claimant's physical

and mental health that bears on the issues discussed by the Court in this decision.

### 1.  Claimant's Testimony at the Administrative Hearing

On August 23, 2017, Claimant testified at the administrative hearing in response to

questions by the ALJ and her attorney.  (R. 34-67).  She testified that she filed for disability

because she does not think there is work available for her since she is "unable to sit, stand [or]

maintain any type of position for any length of time."  (R. 41).  Claimant explained that her pain

is worse in her lower left back and is constant, that sitting aggravates her condition, and that she can only sit for about 20 minutes at a time. (R. 48). After Claimant explained how lying down reduces the intensity of her back pain, the ALJ inquired as to the level of her pain on a scale of one to ten without medication. She responded it is a "five" without medication and a "three" with medication. (R. 50). Upon examination by her attorney, Claimant further explained that her pain is a level "eight" "after sitting [for] a long time." (R. 52). She also testified that she "[c]urrently" spends "a good part of the day laying down," that she might be up moving or sitting maybe ten minutes out of an hour, and that after ten to twenty minutes of sitting she would probably lie down for an hour or so. (R. 52). Taking this action would reduce her pain from a level of eight down to a level of four or five. (R. 52).

In response to the ALJ's inquiry as to why Claimant did not undergo the left sacroiliac joint injection as recommended in 2016 and 2017, she testified that she "had those injections before with no success" and that she did not "have the money to do it" and could not afford the insurance "co-pays anymore." (R. 46). In response to the ALJ's inquiries as to why she did not continue to participate in massage therapy, acupuncture, and physical therapy, Claimant responded each time that she "cannot afford it." (R. 58). In particular, Claimant testified that she had spent everything she had worked thirty-five years for, "including [her] kids' college money." (R. 59).

Finally, Claimant testified that she often worried and that this – along with her pain – caused her to be unable to fall asleep even when she was very tired. (R. 55-56). Claimant was receiving mental health treatment for her excessive worrying and her psychiatrist (Pradeep Thapar, M.D.) prescribed Trazadone (Desyrel), Clonazepam (Klonopin), and Mirtazapine

(Remeron) to treat her condition. (R. 55-56). Claimant took her medications as prescribed. (R. 56).

### 2. Medical Evidence Considered by the Agency Consultants

#### a. Evidence Regarding Claimant's Physical Health

Claimant was diagnosed with scoliosis and low back pain in February 2014 and prescribed Norco for her pain. (R. 471-73). On April 20, 2014, Claimant reported to Advocate South Suburban Hospital's emergency room and complained of severe mid-back pain. (R. 321). The treatment notes state that Claimant had back surgery in 1984 with a Harrington rod placement for scoliosis and that "there is an increased incidence of chronic pain in people who have had Harrington rod placement." (*Id.*). An MRI of Claimant's thoracic spine was performed on April 20, 2014 and it and showed "[m]ild multilevel degenerative change," (R. 315-16), and an MRI of her lumbar spine showed narrowing of the intervertebral disc space – but the overall findings were determined to be similar to those of MRIs in 2007. (R. 317-18).

In October 2014, Claimant reported experiencing an increased level of pain from sitting and Dr. William Will referred her to neurology and increased her pain medications. (R. 481). On January 9, 2015, Claimant informed Dr. Will that due to significant pain, she is unable to stand for long periods of time. (R. 483). Claimant was seen by Dr. Anil Kesani, an orthopedist, on January 19, 2015, and was diagnosed with: (i) degeneration of the lumbar, thoracic, and cervical spine; (ii) neck, lumbar, and thoracic pain and a strain; (iii) low back pain; (iv) lumbosacral spondylosis without myelopathy; and (5) sacroiliitis.[3] (R. 355). Dr. Kesani referred

---

[3] Sacroiliitis is defined as "an inflammation of one or both of your sacroiliac joints — situated where your lower spine and pelvis connect." Further, the condition has been identified with causing pain in the lower back, and the pain is typically worsened by "prolonged standing or stair climbing." *See* Sacroiliitis Overview, available at: https://www.mayoclinic.org/diseases-conditions/sacroiliitis/symptoms-causes/syc-20350747#:~:text=Sacroiliitis%20(say%2Dkroe%2Dil,climbing%20can%20] worsen%20the%20pain. (last visited Jan. 24, 2022).

Claimant to physical therapy, prescribed naproxen for inflammation, and performed a Celestone injection into her right sacroiliac joint (after which Claimant reported immediate pain relief).[4] (*Id.*). A lumbar MRI performed on February 20, 2015, showed that Claimant had "[s]light retrolisthesis with [a] disc bulge and bony degenerative changes cause[d] moderate right and mild left foraminal stenosis at L3-4;" mild changes at L4-5; and "[d]egenerative disc disease with sparing at L5-S1." (R. 596).

On February 3, 2015, Claimant began physical therapy and was discharged on May 13, 2015. (R. 360-440). The treatment records show that Claimant's pain at rest was a seven out of ten when she began physical therapy and her pain ranged between a four out of ten (at best) and a ten out of ten (at worst) during the preceding twenty-four hours. (R. 402). By March 31, Claimant's pain level was reduced to a one or two out of ten at rest and her pain ranged between a zero out of ten at best and a six out of ten at worst during the previous twenty-four hours. (R. 402). Furthermore, although Claimant's pain at the end ranges of her active lumbar flexion improved from a moderate impairment at the outset of therapy to a mild impairment as of March 31, 2015, Claimant continued to have a "severe activity limitation," according to her score on the back index. (R. 403). When she was discharged from therapy on May 13, 2015, Claimant's pain level at rest was a three out of ten and her pain ranged from a zero out of ten at best and a five out of ten at worst during the preceding twenty-four hours. (R. 438-39). Her pain at the end ranges of her active lumbar flexion remained mild and she continued to have a "severe activity limitation" per her back score. (R. 439). The therapist noted that Claimant had improved since

---

[4] Celestone is described as "an epidural injection for the treatment of lower back pain," and has been determined to reduce "lower back and radicular pain in more than half the patients." *See* Efficacy of Epidural Injections of Kenalog and Celestone in the Treatment of Lower Back Pain, available at: https://pubmed.ncbi.nlm.nih.gov/14573415/ (last visited Jan. 24, 2022).

the beginning of physical therapy but that she had "plateaued." (*Id.*) He further noted that

although "her strength ha[d] improved it has not correlated with a reduction in symptoms." (*Id.*).

### b. Evidence Regarding Claimant's Mental Health

Claimant was first seen for treatment by psychiatrist Pradeep Thapar, M.D. on January

22, 2014. (R. 442-43). Dr. Thapar's progress notes reflect that Claimant had a diagnosis for

major depressive disorder, as well as recurrent and generalized anxiety disorder. (R. 442).

Claimant denied any psychiatric problems and described no depressive symptoms and Dr.

Thapar noted that her mood was euthymic with no signs of depression or anxiety. (*Id.*)

Nonetheless, Dr. Thapar continued Claimant's current prescriptions for Remeron, Trazodone,

Klonopin, and Nuvigil.[5] (*Id.*) Dr. Thapar examined Claimant on March 27, 2014, June 10,

2014, August 22, 2014, October 28, 2014, January 14, 2015, March 26, 2015, August 26, 2015,

November 11, 2015, and January 26, 2016. (R. 444-58, 506-11). During each of these visits,

Claimant – as with her first visit with Dr. Thapar – denied any psychiatric problems or

depressive or anxiety symptoms and Dr. Thapar's observations were consistent with Claimant's

self-reporting. (*Id.*). Even so, Dr. Thapar maintained Claimant's regimen of anti-depressant and

anti-anxiety medications. (R. 445, 447, 449-50, 451-52, 453-54, 455, 457, 507, 509, 511).

### 3. Opinions from Agency Consultants

On October 17, 2015, Dr. Albert Osei reviewed Claimant's medical records and

performed an internal medicine consultative examination. (R. 491-95). Dr. Osei reported that

---

[5] Trazadone and Remeron are antidepressant drugs prescribed for the treatment of major depressive disorder. *See Winters v. Barnhart*, 153 Fed.Appx. 846, 847 (3d Cir. 2005); *Pantoja Santiago v. Comm'r of Soc. Sec.*, No. 18CV1226KPFBCM, 2019 WL 6831533, at *3 n.7 (S.D.N.Y. July 23, 2019), *report and recommendation adopted*, No. 18 CIV. 1226 (KPF), 2019 WL 3798055 (S.D.N.Y. Aug. 13, 2019); *Askins v. Astrue*, No. EDCV08-10573 (SS), 2009 WL 2949611, at *6 (C.D.Cal. Sept. 14, 2009). "Klonopin is an anti-anxiety drug, generally used to control seizures and panic attacks." *United States v. Sarver*, No. CR 05-0673 JSW JL, 2006 WL 2669006, at *4 (N.D.Cal. Sept. 18, 2006); *Akins*, 2009 WL 2949611, at *6.

Claimant's problems included a history of scoliosis status post corrective surgery, lower back pain, reduced range of motion of the right shoulder joint because of pain, and depression and anxiety. (R. 495). Dr. Osei examined Claimant and noted, among other things, that: (i) her range of motion in her lumbar spine and her right shoulder were reduced due to pain; (ii) her "affect [wa]s normal"; and (iii) "[t]here [we]re no signs of depression, agitation, irritability or anxiety." (R. 494-95).

On November 13, 2015, Dr. Richard Hamersma reviewed Claimant's mental health treatment records through October 17, 2015, and opined that Claimant had a "mild" restriction of activities of daily living, "mild" difficulties in maintaining social functioning, and "mild" difficulties "in maintaining concentration, persistence and pace." (R. 74). Dr. Hamersma further opined that Claimant's diagnoses of depression and anxiety were "non-severe mental impairments." (R.73-74). On November 20, 2015, Dr. Charles Kenney reviewed Claimant's treatment records regarding her spine condition and determined that her statements regarding the intensity and persistence of her symptoms were "exaggerated when compared to the totality of the evidence in the file." (R. 75). Among other things, Dr. Kenney noted that Claimant's "[c]urrent x-ray of the T-spine revealed mild multilevel degenerative changes" and that "she had mildly reduced ROM [range of motion] of the lumbar spine" and a "decreased ROM of the right shoulder of unknown etiology." (R. 77). Lastly, Dr. Kenney opined that Claimant had the RFC to perform a reduced range of light work. (R. 77-78).

At the reconsideration level, Claimant's medical records were reviewed by psychologist Russell Taylor, Ph.D, on March 22, 2016, and by Reynaldo Gotanco, M.D., on March 26, 2016. (R. 81-93). Both doctors noted that Claimant reported no changes or new conditions at

reconsideration (R. 88, 91) and confirmed the opinions of Drs. Hamersma and Kenney.  (R. 85-93).

### 4.    Medical Evidence Post-dating the Agency Consultants' Reviews

#### a.    Evidence Regarding Claimant's Physical Health

On February 1, 2016, Claimant reported to Dr. Will that she was trying to get disability payments for chronic pain because she could not stand or sit for any length of time without severe pain.  (R. 546).  Claimant also reported that Norco helped to control the pain but that working was a chore even when she was taking it.  (R. 546).  By June 10, 2016, Claimant reported that her pain had worsened to the point where it was a nine out of ten on a bad day even with her Norco and  a ten out of ten without Norco.  (R. 540).  By the end of June 2016, Claimant's pain became so severe that she began taking extra doses of Norco even though Dr. Will had expressly advised her not to do so.  (R. 552).

On June 15, 2016, Claimant saw Dr. George Miz and he ordered x-rays of Claimant's lumbar spine and compared the x-rays films to an MRI performed in 2015.  (R. 591, 593).  Relative to the 2015 MRI, Dr. Miz found that the 2016 x-rays films showed "significant disk degeneration at L3-L4 and milder changes at L4-L5 and L5-S1."  (*Id.*).  He diagnosed Claimant with "low back pain related to adjacent segment degeneration below her T11-L3 fusion."  (*Id.*).  Dr. Miz recommended epidural injections to help manage Claimant's pain and informed her that if the injections did not work, he would recommend surgery to extend her spinal fusion "to the sacrum and pelvis."  (*Id.*).

Claimant was examined by Dr. Neeraj Jain on June 27, 2016.  Dr. Jain opined (in accord with Dr. Miz) that the diagnostic x-rays films showed "significant disc degeneration at L3-L4 and to a lesser degree at L4-L5 and L5-S1."  (R. 580-81).  Dr. Jain recommended that Claimant

undergo "facet joint injections below her fusion at L3-L4, L4-L5 and L5-S1." (R. 581).

Accordingly, on August 4, 2016, Dr. Jain performed the facet joint injections. (R. 600-01). At a

follow-up appointment on August 29, Claimant stated that she had experienced some reduction

in her pain, but that her pain level had increased again. (R. 576). Dr. Morgan recommended that

Claimant undergo a left sacroiliac joint injection, but noted that if the effects were not long-

lasting, she should consider undergoing either "medial branch blocks of the lower lumbar facet

joint" or "lateral branch blocks of the left S1 joint." (*Id.*).

On November 18, 2016, Dr. Will diagnosed Claimant with Flatback Syndrome.[6] (R.

539). On May 1, 2017, Dr. Aileen Robitaille examined Claimant and noted that "she continues

to have palpable tenderness on the midline and the left paravertebral muscles of the lumbar

spine" and decreased range of motion with pain. (R. 572). Dr. Robitaille recommended that

Claimant undergo a left sacroiliac joint injection – as previously recommended in August 2016.

(R. 573). If that treatment did not provide long-lasting benefits for Claimant, Dr. Robitaille

indicated that he would "consider doing a medial branch block for her lower lumbar facet joints

to prognosticate the efficiency of a longer-lasting radiofrequency ablation." (R. 573).

### b.     Evidence Regarding Claimant's Mental Health

Dr. Thapar continued to treat Claimant. During office visits on April 20, 2016, and July

12, 2016, Claimant denied any psychiatric problems and described no depressive symptoms. (R.

520, 523). Although Dr. Thapar noted that Claimant's mood was euthymic with no signs of

---

[6] Flatback Syndrome is defined as "the loss of the normal lumbar lordosis," which is the normal curvature
in the lumbar spine. A person suffering from this condition may experience "difficulty standing upright,
chronic pain, and difficulty with daily tasks." *See* Flatback Syndrome, available at:
https://www.columbiaspine.org/condition/flatback-syndrome/#:~:text=Flatback%20syndrome%20is%20a
%20condition,a%20lordosis%2C%20or%20inward%20curve. (last visited Jan. 24, 2022).

depression or anxiety, he continued her prescriptions for Remeron, Trazodone, Klonopin, and Nuvigil. (R. 520-21, 523-24).

Claimant's next office visit on September 29, 2016, however, was different. Claimant reported to Dr. Thapar that her anxiety symptoms were continuing, she was having anxiety attacks many times during the day, and her anxiety was causing sleep disturbance. (R. 526). Dr. Thapar noted that Claimant showed "[s]igns of mild depression," her demeanor was sad, and her thought content was depressed. (R. 526). Dr. Thapar again maintained Claimant's medication regimen. (R. 527).

During her next two office visits on December 15, 2016 and February 28, 2017, Claimant again denied any psychiatric problems and described no depressive or anxiety symptoms. (R. 529, 532). Dr. Thapar noted that her mood was euthymic with no signs of depression or anxiety, and he maintained her medication regimen. (R. 529-30, 532-33).

During her last pre-hearing office visit on May 11, 2017, Claimant's condition took another turn. Dr. Thapar's progress notes from this visit indicate that Claimant:

> SAYS SHE IS VERY ANXIOUS AND SPOKE ABOUT HER MONEY SITUATION AND FEELS BETTER NOW AND WITH LOTS OF SLEEP ISSUES AND FEELS THINGS ARE NOT GOOD AT HOME WITH THE MONEY AND THUS CANNOT SLEEP. Anxiety symptoms are present. Continuing anxiety symptoms have been observed. The subjective feeling of anxiety is occurring. The subjective feeling of apprehension is described. Episodes of Tachycardia, rapid breathing and sweating have been occurring. Certain situations evoke anxiety symptoms and she avoids them. [Claimant] reports chest pains and other symptoms referable to the hear are occurring. Sensations of choking when anxious are occurring. Feelings of depersonalization are occurring. [Claimant] has sensations of derealization. Dizziness is reported. [Claimant] is experiencing fewer feelings of embarrassment and self consciousness in social situations. She has episodes of irritability. Uncomfortable feeling[s] of burning, prickling or tingling skin sensations are present. She has episodes of motor restlessness associated with anxiety. Sleep disturbance caused by anxiety is present.

(R. 535) (emphasis in original).

Dr. Thapar examined Claimant and noted that: (i) she presented as glum, doleful, and wary; (ii) she appeared anxious; (iii) she had signs of mild depression, her speech and thinking appeared to be slowed by a depressed mood, and her facial expression and general demeanor revealed a depressed mood; (iv) her demeanor was sad and glum and her affect was blunted; (v) her insight into problems and judgment appeared to be poor; and (vi) she displayed irritability, startle response, and sweaty palms. (R. 535). Dr. Thapar discussed the risks/benefits/side effects and alternative treatment options with Claimant and urged her to call 911 and go to the emergency room with any emergencies. (R. 536).

### 5. Vocational Expert's Testimony

The Vocational Expert ("VE") reported that Claimant had relevant past work as a registered representative and that this is a sedentary position and was performed as such. (R. 62). The VE testified that a hypothetical person who could sit, stand, and/or walk for about six hours in an eight-hour workday with normal breaks and certain exertional, postural, and manipulative limitations would be capable of performing the requirements of Claimant's past work. (R. 63). He further testified that employers have a maximum tolerance for 10% of time off-tasks (exclusive of authorized breaks) and that a person who must alternate from a sitting or standing position or must get up to stretch periodically would have an increased amount of time off-task. (R. 65). Lastly, he opined that a person who is unable to maintain eight hours of exertion on a sustained basis would be precluded from performing Claimant's past work or any work at all. (R. 65).

## II. THE ADMINISTRATIVE LAW JUDGE'S DECISION

On December 7, 2017, the ALJ issued a decision finding Claimant not disabled. (R. 28). Applying the five-step sequential evaluation that governs disability cases, the ALJ found at step

one that Claimant had not engaged in substantial gainful activity since her alleged onset date of January 3, 2015. (R. 19). Her severe impairments at step two were "degenerative disc disease, arthropathy and history of right rotator cuff strain," and her non-severe impairments were depression and anxiety.[7] (R. 19-20). The ALJ determined at step three that none of Claimant's impairments met or medically equaled a listed impairment – either singly or in combination with one another. (R. 22).

With respect to Claimant's physical impairments, the ALJ found that "the evidence of record simply does not support her allegations of disabling limitations." (R. 24). In particular, the ALJ found that "the medical evidence is sparse and reflects a history of sporadic, routine, and conservative treatment during the relevant period that is inconsistent with the degree of limitation alleged by [C]laimant." (R. 24). The ALJ relied on the opinions of the State agency medical consultants (Drs. Kenney and Gotanco), who "were able to review *most* of the claimant's medical records." (R. 26) (emphasis added). The ALJ further found that Claimant's "diagnostic scans showed only relatively mild degenerative changes of the lumbar spine" and he relied on the October 17, 2015 report of Dr. Osei (another agency consultant), who noted that Claimant "did not appear to be in any distress at rest." (R. 23). The ALJ also disregarded Dr. Will's February 1, 2016 and April 10, 2017 treatment records noting that Claimant was unable to work due to an inability to sit for any length of time (R. 546, 539) because it was unclear whether this observation reflected Dr. Will's opinion or Claimant's statement of her medical history and because the observation was inconsistent with Dr.] Osei's prior observation. (R. 26).

---

[7] Arthropathy is described as "a form of low back pain caused by osteoarthritis in the facet joints (also known as zygapophyseal joints) in the spine." Facet Arthropathy, available at: https://www.hss.edu/condition-list_facet-arthropathy.asp (last visited Jan. 24, 2022).

With respect to Claimant's mental impairments, the ALJ assigned great weight to the opinions of psychologists Hamersma and Taylor (both agency consultants) and found that Claimant's "medically determinable mental impairment[s] of depression and anxiety do not cause more than minimal limitation in the claimant's ability to perform basic mental work activities and are therefore non-severe." (R. 20). The ALJ analyzed the treatment records that were entered into the record after the consultants' reviews and found that the mental status examinations were normal with the exception of two occasions where Claimant "endorsed anxiety and irritability." (R. 20). The ALJ also "emphasize[d] that the claimant did not allege any depression or anxiety during the hearing." (R. 20).

Before moving to step four, the ALJ determined that the record did not fully support Claimant's statements regarding the restrictions imposed by her symptoms. (R. 23-4). The ALJ referenced the "spare" nature of the medical evidence. (R. 24). He also rejected Claimant's testimony that she was unable to pay for co-insurance and the insurance co-pays associated with additional treatment that her physicians recommended based on his finding that Claimant had some available financial resources because one of her sons was "involved in hockey." (R. 24-25).

The ALJ further found that Claimant had the RFC to perform light work as that exertional level is defined in 20 C.F.R. §404.1567(b). (R. 23). In particular, the ALJ concluded that Claimant could: (i) lift up to twenty pounds occasionally; (ii) lift or carry up to ten pounds frequently; (iii) stand and/or walk for approximately six hours per eight-hour workday; and (iv) sit for approximately six hours per eight-hour workday, with normal breaks. (R. 23). The ALJ further found that Claimant could occasionally lift up to twenty pounds, and frequently up to ten; can stand, sit and/or walk "for approximately six hours per eight-hour workday with normal

breaks;" can frequently climb ramps or stairs, balance, kneel, and crawl; "but is limited to occasional climbing of ladders, ropes, or scaffolds, stooping and crouching; and is "limited to frequent overhead reaching with the right upper extremity." (R. 23).

Relying on the testimony of the VE, the ALJ determined at step four that Claimant could perform her past relevant work as a registered representative because performing that job would not conflict with her RFC. (R. 26-27). Because the ALJ determined that Claimant could perform her past relevant work, he concluded that she was not disabled under the Act. (R. 27).

## III.     STANDARD OF REVIEW

A claimant who is found to be "not disabled" may challenge the Commissioner's final decision in federal court. Judicial review of an ALJ's decision is governed by 42 U.S.C. §405(g), which provides that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. §405(g). "Substantial evidence is not a high threshold: it means only 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Karr v. Saul*, 989 F.3d 508, 511 (7th Cir. 2021), *quoting Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019) (internal quotation marks omitted). The Commissioner's decision must also be based on the proper legal criteria and be free from legal error. *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

A court reviews the entire record, but it does not displace the ALJ's judgment by reweighing the facts, resolving conflicts, deciding credibility questions, making independent symptom evaluations, or otherwise substituting its judgment for that of the Commissioner. *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011); *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). Instead, the court looks at whether the ALJ articulated an "accurate and logical

bridge" from the evidence to her conclusions. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). This requirement is designed to allow a reviewing court to "assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review." *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002). Thus, even if reasonable minds could differ as to whether the claimant is disabled, courts will affirm a decision if the ALJ's opinion is adequately explained and supported by substantial evidence. *Elder*, 529 F.3d at 413 (citation omitted).

## IV.   DISCUSSION

Plaintiff asserts that the ALJ made a number of errors which require remand. Among other things, Plaintiff asserts that the ALJ erred by: (a) giving substantial weight to the opinions of the agency consultants despite the fact that the record contained significant medical evidence regarding Claimant's physical and mental impairments that post-dated the consultants' opinions; (b) assessing the medical evidence which post-dated the consultants' opinions himself rather than submitting the evidence to medical experts for evaluation; (c) failing to include Claimant's mild restrictions in concentration, persistence, or pace into the RFC; and (d) finding that Claimant had the financial means to afford recommended medical treatment based on the fact that one of her sons plays hockey. For the reasons stated below, the Court agrees with Plaintiff on these points and the ALJ's decision must be remanded.[8]

### A.   The ALJ Erred by Giving Substantial Weight to the Outdated Opinions of the Agency Consultants

The ALJ placed great weight on the opinions of the agency consultants, who rendered their opinions regarding Claimant's physical and mental health between October 17, 2015, and

---

[8] Plaintiff asserts that the ALJ made other errors as well. Based on its conclusion that remand is required for the above reasons, the Court need not address Plaintiff's arguments regarding these remaining errors and the Commissioner should not assume these issues were omitted from this decision because no errors were found regarding those issues.

March 26, 2016. *Supra*, at Section I(C)(3). However, the record contains significant evidence regarding Claimant's physical and mental health that post-dated the consultants' opinions. *Supra,* at Sections I(C)(4)(a)-(b). In particular, Claimant was diagnosed with Flatback Syndrome; had x-rays of her lumbar spine taken in June 2016 which showed "significant disk degeneration" relative to an MRI from 2015; and had two office visits with her psychiatrist in September 2016 and May 2017 during which she reported – for the first time – anxiety attacks, anxiety symptoms, mild depression, and (on the latter visit) physical manifestations of her mental distress.

It is well settled that "ALJs may not rely on outdated opinions of agency consultants 'if later evidence containing new, significant medical diagnoses reasonably could have changed the reviewing physician's opinion.'" *Lambert v. Berryhill*, 896 F.3d 768, 776 (7th Cir. 2018), *quoting Moreno v. Berryhill*, 882 F.3d 722, 728 (7th Cir. 2018), *as amended on reh'g*, (Apr. 13, 2018); *Meuser v. Colvin*, 838 F.3d 905, 912 (7th Cir. 2016) (citing cases); *Eric N. v. Saul*, 1:20CV93, 2021 WL 822809, at *9 (N.D.Ind. Mar. 4, 2021) ("Seventh Circuit precedent forbids an ALJ from relying on agency-contracted reviewing opinions which are given without knowledge of significant and complex medical evidence which might alter their prior opinions.").

Because the Court finds that the evidence within Claimant's post-March 2016 medical records might reasonably have altered the agency consultants' opinions regarding the severity of Claimant's physical and mental impairments, remand is warranted. *See, e.g., Moreno*, 882 F.3d at 728 (finding it was error to rely on outdated assessment where treatment notes "reveal significant and new developments in [claimant's] mental health that could have affected [the physician's] assessment"); *Stage v. Colvin*, 812 F.3d 1121, 1125 (7th Cir. 2016) (finding that

"evidence of further spinal degeneration" was a "significant, new, and potentially decisive finding[]" that "could reasonably change the reviewing physician's opinion"); *Goins v. Colvin*, 764 F.3d 677, 679-80 (7th Cir. 2014) (finding the ALJ's uncritical acceptance of consultants' conclusions "unsound" when the consultants, among other things, had not been shown the results of a more recent MRI that showed a worsening of plaintiff's spinal problems); *Nicole M.S. v. Saul*, No 19 C 7798, 2021 WL 534670, at *12 (N.D.Ill. Feb. 12, 2021) (finding that the ALJ erred by relying on agency consultants where "the record contained substantial evidence demonstrating the worsening of [claimant's] mental condition" since the consultants' review); *Kevin George K. v. Berryhill*, No. 18 CV 3639, 2019 WL 2122987, at *4 (N.D.Ill. May 15, 2019) (citing *Moreno* and noting that significant and new developments in claimant's mental health could have affected the reviewing physician's opinion).

**B.    The ALJ Erred by Assessing the Medical Evidence That Post-dated the Agency Consultants' Opinions**

The Seventh Circuit has made it clear that "'ALJs are required to rely on expert opinions instead of determining the significance of particular medical findings themselves.'" *Stage*, 812 F.3d at 1125, *quoting Moon v. Colvin*, 763 F.3d 718, 722 (7th Cir. 2014).  However, the ALJ did not submit Claimant's post-March 2016 medical records for the agency consultants' review. Instead, the ALJ referenced the records and drew his own conclusions.  For example, the ALJ reviewed Dr. Miz's June 15, 2016 report, found that Claimant did not return to physical therapy or obtain a sacroiliac joint injection despite "recently present[ing] for treatment with complaints of lower back pain," and made no comment regarding the 2016 x-ray films that found that she "exhibits significant disk degeneration at L3-L4" relative to her 2015 MRI.  (R. 26 (citing exhibits including Exhibit 14F/23)).[9]  The ALJ also referenced the records from Claimant's

---

[9] Dr. Miz's June 15, 2016 report is Exhibit 14F at pages 21-23 and is located at R. 519-593.

September 2016 and May 2017 office visits with Dr. Thapar, which post-dated the consultants' opinions, and noted that, although Claimant "endorsed anxiety and irritability twice," she had "normal cognitive functioning, memory, fund of knowledge, and alertness." (R. 20 (citing 12F/8, 17)).[10]

The ALJ "impermissibly 'played doctor'" when he interpreted Claimant's medical records on his own without referring them to the medical experts for analysis and this error requires remand. *See, e.g., Akin v. Berryhill*, 887 F.3d 314, 317-18 (7th Cir. 2018); *McHenry v. Berryhill*, 911 F.3d 866, 871 (7th Cir. 2018) ("We agree with McHenry that the ALJ impermissibly assessed the MRI report on his own without the assistance of a medical expert. We have said repeatedly that an ALJ may not play[] doctor and interpret new and potentially decisive medical evidence without medical scrutiny") (internal quotation marks omitted); *Stage*, 812 F.3d at 1125; *Nichole M.S.*, 2021 WL 534670, at *12 ("The ALJ was not free to interpret the post-September 2017 mental health evidence . . . . Instead, medical expertise was required to determine the significance of the post-September 2017 mental health evidence and assess functional capacity.").

### C.    The ALJ Erred by Not Incorporating Claimant's Mild Limitation in Maintaining Concentration, Persistence, and Pace into Her RFC

Plaintiff asserts that even had it been proper for the ALJ to rely on the opinions of the consultative psychologists regarding Claimant's mental status, it was an error for the ALJ to not "include any work-related functional restrictions that stemmed from [her] non-severe [mental health] impairments." (Dckt. #17 at 7). This Court agrees.

---

[10] The notes from Claimant's September 29, 2016 office visit with Dr. Thapar begin at R. 526 and the notes from her May 11, 2017 office visit begin at R. 535.

It is well-settled that the ALJ must incorporate a claimant's mental impairments into her RFC, even if those mental impairments are non-severe. *See, e.g., Pepper v. Colvin*, 712 F.3d 351, 366 (7th Cir. 2013). Consequently, the RFC assessment and/or any hypothetical questions posed to the VE must account for any documented limitations a claimant suffers in maintaining concentration, persistence, and pace, and the ALJ's failure to do so requires remand. *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 619 (7th Cir. 2010); *Moreno*, 882 F.3d at 730; *Radosevich v. Berryhill*, 759 Fed.Appx. 492, 494-95 (7th Cir. 2019) (remanding where the hypothetical failed to account for the claimant's deficiency in being able to execute a simple task over an extended period of time).

The purpose of accounting for these documented limitations is to "exclude from the VE's consideration those positions that present significant problems of concentration, persistence and pace." *Winsted v. Berryhill*, 923 F.3d 472, 477 (7th Cir. 2019), *quoting O'Connor-Spinner*, 627 F.3d at 620. This is especially important where the claimant's past work was a "skilled position." *See, e.g., Simon-Leveque*, 229 F.Supp.3d at 787-88 (explaining that a mild limitation in concentration, persistence, or pace could impact one's ability to work in a skilled position); *Hall v. Saul*, No. 3:19-CV-354-PPS, 2020 WL 2507932, at *4 (N.D.Ind. May 15, 2020) (a "finding that someone can return to a highly skilled job like an accountant, has inherent incompatibility with a finding that an individual has a limited ability to maintain their concentration"); *Cheryl C. v. Berryhill*, No. 18 C 1443, 2019 WL 339514, at *3 (N.D.Ill. Jan. 28, 2019) (finding it was "critical" to address the claimant's limitation in maintaining concentration, persistence and pace since her past work was an "administrative assistant—a skilled position").

In this case, Drs. Hamersma and Taylor found that Claimant had a mild limitation in maintaining concentration, persistence, and pace, (R.74, 87), and the ALJ incorporated that

finding in his analysis of Claimant's mental impairments, (R. 21).[11]  However, the ALJ's

assessment of Claimant's RFC assessment does not account for any limitations from her non-

severe mental impairments, nor did any of the hypothetical questions posed by the ALJ to the

VE.  Given that Claimant's past work as a registered representative for the financial industry is

listed as a skilled position with a specific vocational preparation ("SVP") level of seven (R. 62),

the ALJ's failure to account for Claimant's documented limitations in maintaining concentration,

persistence, and pace in her RFC and the hypothetical questions is an error warranting remand.

*O'Connor-Spinner*, 627 F.3d at 619; *Moreno*, 882 F.3d at 730; *Radosevich*, 759 Fed.Appx. at

494–95.

> ### D.    The ALJ's Finding That Claimant Had the Financial Means to Afford Medical Treatment Was Improperly Based on Speculation

An ALJ should not draw negative inferences from a claimant's failure to seek treatment

"unless the ALJ has explored the claimant's explanations as to the lack of medical care" and

found that the claimant did not have a good reason.  *Craft*, 539 F.3d at 679.  As the Seventh

Circuit has recognized, "the agency has expressly endorsed the inability to pay as an explanation

excusing a claimant's failure to seek treatment."  *Roddy v. Astrue*, 705 F.3d 631, 638 (7th Cir.

2013); *Glenn H. v. Saul*, No. 18 C 6008, 2019 WL 6112684, at *6 (N.D.Ill. Nov. 18, 2019).  This

is quite sensible.  If a person cannot afford medical treatment, they cannot obtain the treatment

---

[11] The Commissioner cited to *Jozefyk v. Berryhill*, 923 F.3d 492, 497 (7th Cir. 2019), where the Seventh Circuit found it was not an error for the ALJ to not account for any limitations in maintaining concentration, persistence, and pace.  In a later decision, however, the Seventh Circuit explained that its holding in *Jozefyk* was limited to the particular facts of that case.  *Crump v. Saul*, 932 F.3d 567, 571 (7th Cir. 2019).  Moreover, unlike in *Jozefyk*, the record here contains evidence from doctors documenting Claimant's mild limitation in concentration, persistence, and pace, (R. 74, 87), and testimony from Claimant that she has memory issues, (R. 55-56, 262, 264).  *See, e.g., Hall*, 2020 WL 2507932, at *4 (finding that case distinguishable from *Jozefyk* because the record included "testimony from Hall about her inability to concentrate, as well as other objective medical evidence relating to her mental conditions").

even if they desperately need it.  Consequently, their failure to obtain the treatment in this situation does not mean that they did not need the treatment.

In this case, the evidence shows that Claimant's physicians recommended that Claimant get another sacroiliac joint injection, but she did not do so.  Claimant testified that she "had those injections before with no success[,]" and that she does not have "the money to do it anymore." (R. 46).  Claimant further explained that she "can't afford [insurance] co-pays anymore," (*Id.*), and has "spent everything that [she] ha[s] worked 35 years for." (R. 59).  The ALJ rejected Claimant's testimony on this point, finding that "her son is involved in hockey, which presumably means that she does have some financial resources and that her complaints must not have been as limiting as to warrant paying for her allegedly necessary medical care."  (R. 25).

This was error.  At no point did the ALJ determine what cost (if any) that Claimant incurred because of her son's participation in hockey.  Consequently, the ALJ's presumption that Claimant devoted significant financial resources toward her son's pursuit of hockey rather than spending the funds on medical treatment is nothing more than speculation.  "Speculation is . . . no substitute for evidence, and a decision based on speculation is not supported by substantial evidence." *White ex rel. Smith v. Apfel*, 167 F.3d 369, 375 (7th Cir. 1999).  Accordingly, the ALJ's decision to reject Claimant's testimony about her lack of financial means was not supported by substantial evidence and must be reassessed on remand.

## CONCLUSION

For the reasons stated above, Plaintiff's motion for summary judgment (Dckt. #17) is granted and the Commissioner's cross-motion for summary judgment (Dckt. #24) is denied.  The decision of the Commissioner is reversed, and the case is remanded for further proceedings consistent with this Memorandum Opinion and Order.

ENTERED:   **January 25, 2022**

_____
**Jeffrey I. Cummings**
**United States Magistrate Judge**